UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD DAVENPORT, JR.,

        Plaintiff,               CIVIL ACTION NO. 10-13842

        v.                    DISTRICT JUDGE NANCY G. EDMUNDS

COMMISSIONER OF            MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

### A.    *Proceedings in this Court*

On September 27, 2010, Plaintiff Richard Davenport, Jr. ("Plaintiff"), acting *in pro per*,

filed the instant suit seeking judicial review of the Commissioner's decision disallowing benefits

(Dkt. No. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was

referred to the undersigned for the purpose of reviewing the Commissioner's decision denying

Plaintiff's claim for a period of Disability Insurance and Supplemental Security Income benefits

(Dkt. No. 5).  This matter is currently before the Court on cross motions for summary judgment

(Dkt. Nos. 12, 14).

Plaintiff's motion for summary judgment was initially due on March 8, 2011, however,

Plaintiff failed to file a motion by that date.  The Court issued an order to show cause (Dkt. No.

13) requiring Plaintiff to explain his failure to file a timely summary judgment motion, or to file

such a motion by October 28, 2011.  On October 28, 2011, Plaintiff filed a letter (Dkt. No. 14)

with the Court.  The Court then issued an order (Dkt. No. 15) satisfying the show cause, and informing Plaintiff that the Court would treat his October 28, 2011 letter as a motion for summary judgment and issue a report and recommendation; the Court further instructed the parties that, if they wanted to submit anything further for the Court's consideration, they should do so by December 23, 2011.  On December 22, 2011, Plaintiff filed 213 pages of medical records (Dkt. No. 16) which are largely duplicative of the records submitted to the ALJ. Defendant did not file any additional papers.

### B.     Administrative Proceedings

Plaintiff filed the instant claims on November 3, 2005, alleging that he became unable to work on December 15, 2004 (Tr. 15, 48, 235).  The claim was initially disapproved by the Commissioner on March 5, 2006 (Tr. 35-38, 239-242).  Plaintiff requested a hearing and, on April 10, 2008, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) Daniel G. Berk, who considered the case *de novo*.  In a decision dated May 28, 2008, the ALJ found that Plaintiff was not disabled (Tr. 12-25).  Plaintiff requested a review of this decision on June 5, 2008 (Tr. 11).  The ALJ's decision became the final decision of the Commissioner on August 20, 2010 when, after the review of additional exhibits[1] (AC-1-8, Tr. 247-290), the Appeals Council denied Plaintiff's request for review (Tr. 4-6).

For the reasons set forth below, this Court finds that the ALJ's decision is this matter contains errors of law.  Accordingly, this Court **RECOMMENDS** that Plaintiff's Motion for

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review.  *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ.  In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

Summary Judgment be **GRANTED**, that Defendant's Motion for Summary Judgment be **DENIED**, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be **REMANDED** for a new hearing consistent with the discussion below.

## II.     STATEMENT OF FACTS

### A.     *ALJ Findings*

Plaintiff was 42 years old on his alleged disability onset date (Tr. 24).  Plaintiff's past relevant work history included work as a janitor/maintenance worker, warehouse worker, dock worker, hi-lo driver and machine operator (Tr. 23).  The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since December 15, 2004, Plaintiff's alleged disability onset date (Tr. 17).  At step two, the ALJ found that Plaintiff had the following "severe" impairments: history of mild cardiomegaly, renal dysfunction, mild hyponatremia, obesity, ascites, dilated cardiomyopathy, history of left heart catheterization, history of implantable cardioiverter-defibrillator placement, congestive heart failure, chronic obstructive pulmonary disease, right middle lobe and right lower lobe atelectatic and/or infiltrative changes, and hypertension" (Tr. 17).  At step three, the ALJ found, in summary fashion, no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 20).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to perform "light work"  (Tr. 20).  At step four, the ALJ found that Plaintiff could not perform any of his past relevant work (Tr. 23).  At step five, the ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as assembly, packaging, sorting, visual inspection,

machine tending, laundry work, fast food work, office cleaning or housekeeping (100,000 such

jobs in Plaintiff's local region and double that number in the state of Michigan) (Tr. 24 ).

    **B.**    *Administrative Record*

        **1.**    **Medical Evidence**

In December 2004, Plaintiff saw Dr. Monique Reeves; Plaintiff was complaining of chest

pain and difficulty in breathing (Tr. 152).  Chest x-rays indicated mild heart enlargement with a

prominent aorta and pulmonary vascular markings (Tr. 152).  Electrocardigram studies showed

sinus tachycardia (Tr. 126).  Physical examination revealed lower extremity edema (Tr. 126).

Plaintiff was diagnosed with congestive heart failure initially, but improved with treatment (Tr.

120).  Doctors advised Plaintiff to start a low-salt diet and avoid substance abuse, drinking, or

smoking (Tr. 121).  At this time, a Dr. Mansoor Naini opined that Plaintiff was "disabled," and

that Plaintiff should start cardiac rehabilitation in the near future (Tr. 121).

Myocardial imaging done by Dr. Cheryl Grigorian in January 2005 indicated an abnormal

ejection fraction[2] (20%) but no evidence of stress-induced myocardial ischemia (Tr. 187).

In 2005, Plaintiff underwent more examinations and treatment for congestive heart

failure (Tr. 211-12). After following a diet and losing weight, Plaintiff showed signs of

improvement in his liver and spleen after previous diagnosis of renal dysfunction (Tr. 211-12).

Plaintiff was admitted to Oakwood Hospital in September 2005 with chest pain and

overall weakness (Tr. 168).  Dr. Eduardo Garcia noted Plaintiff had been a pack-a-day smoker

until December 2004 (Tr. 168); Dr. Garcia also noted that Plaintiff had previously used a

"generous" amount of marijuana (Tr. 168).  Dr. Garcia further stated, somewhat cryptically, that

---

[2]  Ejection fraction is a measurement of the percentage of blood leaving the heart each time it contracts. Because the left ventricle is the heart's main pumping chamber, ejection fraction is usually measured only in the left ventricle (LV). A normal LV ejection fraction is 55 to 70 percent.  *See* http://www.mayoclinic.com/health/ejection-fraction/AN00360 (last visited January 17, 2012)

Plaintiff was "disabled because of who knows" (Tr. 168). During this hospitalization, Plaintiff showed no evidence of congestive heart failure (Tr. 176). Dr. Eric Good noted that Plaintiff had "full functional capacity without limitation" (Tr. 176). Left heart catheterization revealed severe generalized hypokinesis of the left ventricle with normal coronary arteries (Tr. 159). On September 22, 2005, Dr. Good surgically implanted a cardioverter-defibrillator into Plaintiff (Tr. 161). The defibrillator was implanted to address Plaintiff's "severely depressed left ventricle systolic function, ejection fraction 25%" (Tr. 161).

On February 17, 2006, Dr. Mahmood Tariq, a state agency doctor, filled out a Physical Residual Functional Capacity Assessment form (Tr. 96-103). Dr. Tariq opined that Plaintiff could lift 10 pounds occasionally, lift less than 10 pounds frequently and could stand 2 hours per 8-hour workday (Tr. 97). Dr. Tariq further noted that Plaintiff had a "history or cardiomyopathy with EF [ejection fraction] 20-25%" (Tr. 97).

On October 5, 2005, Plaintiff again saw Dr. Naini (Tr. 200-202). Dr. Naini noted that Plaintiff weighted 192 pounds (most likely a typographic error, since Plaintiff's weight tended to range between the high 200s to the low to mid 300s). Plaintiff was again advised to follow a low-salt diet and refrain from smoking (Tr. 200). In April 2006, an electrocardiogram (ECG) study indicated ejection fraction of 28% in the left ventricle (Tr. 197). Dr. Naini noted that Plaintiff "has been able to perform his daily routine activities without limitation" and advised him not to participate in contact sports (Tr. 197). Plaintiff had gained 10 pounds and was advised to modify his diet and lifestyle (Tr. 197). Plaintiff was continued on his medications, which included Aldactone, Coreg, Digitek, Kdur, Lasix and Lisinopril (Tr. 153-54, 197).

In July and September 2007, an ECG study revealed an improved ejection rate of 40-45% (Tr. 231-32).  Dr. Naini noted that Plaintiff's weight had increased by 60 pounds and that he now weighed 352 pounds (Tr. 231).

In March 2008, Dr. Naini noted that Plaintiff had presented with shortness of breath (Tr. 227).  Dr. Naini noted that Plaintiff had been consuming large amounts of marijuana and that this was the cause of his worsening condition (Tr. 227).  Dr. Naini warned Plaintiff that side effects of marijuana included cardiac arrest, congestive heart failure and cardiac arrhythmia (Tr. 227).  Plaintiff was advised to lose weight, modify diet and lifestyle, and take his medication on a regular basis (Tr. 227).  Plaintiff weighed 367 pounds at this time (Tr. 227).

### 2.      Vocational Expert

At the April 2008 hearing, the ALJ posed a hypothetical question to Vocational Expert (VE) Michael Rosko, which assumed an individual of Plaintiff's age, education and vocational background, who could perform light work (Tr. 317).  The VE identified numerous "light" jobs in the region that such an individual could perform, including assembly, packaging, sorting, visual inspection, machine tending, laundry work, fast food work, office cleaning, and housekeeping (Tr. 317-18).

### C.      *Plaintiff's Claims of Error*

This Court is to liberally construe this *pro se* Plaintiff's Complaint and motion for summary judgment.  *See Erickson v. Pardus*, 551 U.S. 89 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  The undersigned has therefore reviewed the entire record, with the understanding that Plaintiff challenges the ALJ's decision as being unsupported by substantial evidence.

## III.    DISCUSSION

### A.    *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious.  *See Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *See Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a

determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)
(the "ALJ's credibility determinations about the claimant are to be given great weight,
particularly since the ALJ is charged with observing the claimant's demeanor and credibility.")
(quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree
is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony,
and other evidence.").  "However, the ALJ is not free to make credibility determinations based
solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486
F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive.
42 U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely
because it disagrees or because "there exists in the record substantial evidence to support a
different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006);
*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more
than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241;
*Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of
choice' within which the Commissioner may proceed without interference from the courts."
*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800
F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See
Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing
the Commissioner's factual findings for substantial evidence, a reviewing court must consider
the evidence in the record as a whole, including that evidence which might subtract from its

weight.  *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits."  *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x. 515, 524 (6th Cir. 2003).  There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled.  F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of
> any medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant

numbers exist in the national economy that [claimant] could perform given [his] RFC and

considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v)

and (g).

### C.     Analysis and Conclusions

I find that the ALJ's decision contains errors of law, thus I recommend that this matter be

remanded for a new hearing.  Specifically, I find that the ALJ erred in the following ways:

### 1.     The ALJ Did Not Give "Good Reasons" For Rejecting The Opinions Of Every Physician In The Record

In this matter, the ALJ rejected the opinions of every physician in the record.  The ALJ's

decision to reject the opinions of Plaintiff's treating physicians and of the state agency doctors

was based almost entirely on an assessment of Plaintiff's credibility.  As discussed in section C,

2 below, there are problems with the ALJ's credibility analysis.  However, even without

considering the ALJ's faulty credibility analysis, it was still error for the ALJ to reject the

opinions of all the physicians in the record in wholesale fashion.

An "ALJ may not substitute his own medical judgment for that of the treating physician

where the opinion of the treating physician is supported by the medical evidence." *Meece v.

Barnhart*, 192 Fed. App'x. 456, 465 (6th Cir. 2006), citing, *McCain v. Dir., Office of Workers

Comp. Programs*, 58 Fed. App'x. 184, 193 (6th Cir.2003) (citation omitted); *see also Schmidt v.

Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("[J]udges, including administrative law judges of

the Social Security Administration, must be careful not to succumb to the temptation to play

doctor" and make their own independent medical findings).  Furthermore, greater deference is

given to the opinions of a treating physician than to those of a non-treating physician; this is

commonly known as the treating physician rule.  *See* SSR 96–2p; *Wilson v. Comm'r of Soc. Sec.*,

378 F.3d 541, 544 (6th Cir. 2004).  "An ALJ must give the opinion of a treating source

controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and not inconsistent with the other substantial evidence in [the] case record.'" *Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)).  Even where an ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must apply the following factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." *Id.*; 20 C.F.R. §§ 416.927, 404.1527.

More important for purposes of this case is that 20 C.F.R. § 404.1527(d)(2) (and § 416.927) "contain[ ] a clear procedural requirement." *Wilson*, 378 F.3d at 544.  In particular, "the [ALJ's] decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188 at *5; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  This procedural requirement is justified on two grounds.  First, the explanation "let[s] claimants understand the disposition of their cases, particularly where a claimant knows that his physician has deemed him disabled and therefore might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Second, the explanatory requirement "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.*

-12-

An ALJ's failure to comply with the procedural, explanatory component of the treating physician rule is typically not harmless error. "A court cannot excuse the denial of a mandatory procedural protection simply because ... there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. '[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway.'" *Wilson*, 378 F.3d at 546. Restated, "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

A state agency physician in this matter opined that Plaintiff could lift 10 pounds occasionally, lift less than 10 pounds frequently and stand or walk 2 hours in an 8-hour workday (Tr. 97). In other words, the state agency physician limited Plaintiff to "sedentary" work. *See* 20 C.F.R. 404.1567(a). In finding that Plaintiff could do "light" work[3], the ALJ thus rejected the opinion of the state agency physician. The only reason the ALJ gave for doing so, was because "[s]ince the state agency examiner failed to consider [Plaintiff's] testimony, the state agency medical examiner's opinion is not entitled to great weight" (Tr. 22). This is not sufficient. The ALJ must provide more explanation for rejecting the opinion of the state agency doctor. More

---

[3] "Light work" involves the following:

[L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. 404.1567(b) and 416.967(b)

particularly, the ALJ must cite to medical evidence in the record in order to reject the opinion of the state agency doctor.

Furthermore, the ALJ rejected the opinions of all of Plaintiff's treating physicians.  Dr. Naini opined similarly to the state agency physician, and limited Plaintiff to "sedentary" work or stated outright that Plaintiff was "disabled."  The reasons the ALJ gave for rejecting Dr. Naini's opinions do not pass muster.  Objective medical evidence – in particular Plaintiff's consistent ejection fraction readings in the 20% range – support Dr. Naini's opinion that Plaintiff suffered from severe heart ailments.  The ALJ's rejected Dr. Naini's opinion largely based upon some notations in the medical records that Plaintiff "had been able to perform his daily routine" (Tr. 23).  While the record does contain some references to improved function, the overall record does not support the ALJ's broad rejection of Dr. Naini's entire set of opinions.  In sum, I find that the ALJ's decision to reject the opinions of Plaintiff's treating physician, Dr. Naini, are not supported by substantial evidence.  Thus, a remand is required.

### 2.      The ALJ Erred in Evaluating Plaintiff's Credibility

I further find that the ALJ's credibility analysis is not supported by substantial evidence. An ALJ has a duty to provide a rational, non-conclusory explanation for his credibility analysis. In particular, Social Security Ruling ("S.S.R.") 96-7p provides, in pertinent part,

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 WL 374186, at *2; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005) ("Regardless of whether harmless error can excuse inadequate articulation of credibility decisions, the strong statement from [S.S.R. 96-7p] constitutes a clear directive to pay as much attention to giving reasons for discounting claimant credibility as must be given to reasons for not fully accepting the opinions of treating sources.").[4]

S.S.R. 96-7p's explanatory requirement does not require an ALJ to explicitly discuss each of the credibility-weighing factors identified in 20 C.F.R. § 404.1529(c)(3). *See Bowman v. Chater*, 132 F.3d 32 (table), 1997 WL 764419, at *4 (6th Cir. 1997) ("While this court applied each of [the § 404.1529(c)(3)] factors in [*Felisky v. Bowen*, 35 F.3d 1027, 1039-1040 (6th Cir. 1994)] we did not mandate that the ALJ undergo such an extensive analysis in every decision."). And, this Court is well aware of the deference owed an ALJ's credibility determinations.[5] But, as the Sixth Circuit has explained,

> [Under Social Security Ruling 96-7p,] blanket assertions that the claimant is not believable will not pass muster, *nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence*. . . . [W]hile credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence.

---

[4] SSRs "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency. 20 C.F.R. § 402.35(b)(1); *see also Evans v. Comm'r of Soc. Sec.*, 320 F. App'x 593, 596, 2009 WL 784273, at *2 (9th Cir. Mar. 25, 2009) ("'Federal statutes, administrative regulations and Social Security Rulings together form a comprehensive scheme of legal standards that ALJs must follow in determining whether a claimant is entitled to disability benefits.'" (quoting *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990)).

[5] Heightened deference to an ALJ's credibility determination is based on the general rule that ALJ factual findings are reviewed for substantial evidence and the more specific rationale that the ALJ is able to evaluate a testifying witness's demeanor while this Court cannot. But the Court does not understand this deference to mean that the ALJ need not provide reasons for discounting a Plaintiff's credibility that are supported by substantial evidence – indeed, this would render much of S.S.R. 96-7p surplusage. Rather, special deference is owed to the ALJ's credibility determination when the ALJ follows the correct process for reaching that determination.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir. 2007) (emphasis added); *see also*

*Bolden v. Comm'r of Soc. Sec.*, No. 03-cv-74136, 2005 WL 1871121, at *8 (E.D. Mich. Aug. 8,

2005) *report adopted by Bolden*, No. 03-cv-74136 (E.D. Mich. July 13, 2005) (explaining that

under S.S.R. 96-7p, "the ALJ's decision must be based on specific reasons for the findings of

credibility. *These reasons must be supported by substantial evidence in the record*." (emphasis

added)).

      In this case, the Court cannot say that the reasons the ALJ gave for discounting Plaintiff's

testimony are supported by substantial evidence.  In evaluating Plaintiff's credibility, aside from

using standardized language (*see* Tr. 16), the ALJ provided:

> [Plaintiff's] testimony was found unresponsive and not credible – his denial of his
> treating doctor's statement that he has been using large amounts of marijuana.  In
> terms of [Plaintiff's] alleged heart problems, [Plaintiff] acknowledged smoking
> marijuana.  On February 3, 2005, Dr. Naini advised [Plaintiff] to avoid substance
> use.  Apparently he was using marijuana and side effect (sic) of marijuana
> especially getting tachycardia and arrhythmia were discussed with him.  On March
> 19, 2008, [Plaintiff] reported worsening of his shortness of breath as he has (sic)
> been consuming large amounts of marijuana, which Dr. Naini reported was
> probably the cause of [Plaintiff's] worsening condition.
>
> Also, [Plaintiff's] assertion that he is not able to work is not found to be credible,
> but is found to be an exaggeration.
>
> Further, this testimony is also inconsistent with [Plaintiff's] testimony that he had
> certified as able and available for work, which he was receiving unemployment
> insurance, and that if he had continued to be eligible for benefits, he would have
> continued to certify that he was able to work and would have done so up to the
> present.
>
>                     \*\*\*
>
> Furthermore, [Plaintiff] has failed to follow the advice fof his treating physician.
> For instance, on January 29, 2007, Dr. Naini reported that [Plaintiff] has not been
> following the diet and has been gaining more weight.  He has, thus, been non-
> compliant.
>
>               (Tr. 21)

(Tr. 138.)  Essentially then, the ALJ gave three justifications for discounting Plaintiff's credibility: testifying untruthfully at the hearing concerning marijuana use, certifying that he was able to work in order to receive unemployment insurance benefits and failure to follow the directions of treating physicians.  Each is problematic.

Turning first to Plaintiff's testimony concerning marijuana use, the ALJ and Plaintiff engaged in the following discussion during the hearing:

Q.    There are indications in the file, particularly in the latest medical reports submitted today by your attorney, that you have problems with substance abuse.  Is that correct?

A.    I wouldn't say I have problems.

Q.    All right, do you use marijuana?

A.    Not often.

Q.    How often do you use marijuana?

A.    Probably since that on (sic) time.

Q.    How often do you use marijuana?

A.    I'll say it's just that one day.

Q.    What day was that?

A.    When I was feeling bad, stomach was hurting, couldn't sleep.

Q.    Who is Dr. Nanie (Phonetic [apparently referring to Dr. Naini])?

A.    That's my heart doctor.

Q.    Okay and in a report on 3 – dated March 19, 2008 Dr. Nanie indicates that you have been consuming large amounts of marijuana.  Where would he have gotten that information?

A.    I guess by checking.

Q.    And what, where, how would he have found that you were consuming large amounts of marijuana?

-17-

A.      I guess when he listened to my chest.

Q.      On a weekly basis, what would the cost of the marijuana you use?

A.      The weekly basis, the cost?

Q.      Yes.

A.      I don't use it weekly.

Q.      What would be the monthly cost?

A.      I don't use it monthly.

Q.      How often to you use it?

A.      I specifically told my doctor, just that one time, I hit some.  I didn't tell
        him that I was smoking everyday.

(Tr. 306-307)

Based upon this testimony, the ALJ concluded that Plaintiff was "unresponsive and not credible"

(Tr. 21).  Specifically, the ALJ found that Plaintiff was untruthful/evasive concerning "his denial

of his treating doctor's statement that he has been using large amounts of marijuana" (*Id.*).  First,

contrary to the ALJ's conclusion, Plaintiff did not deny using marijuana.  Rather, Plaintiff

admitted to smoking marijuana.  The only possible disparity in Plaintiff's testimony concerns the

frequency/amount of Plaintiff's marijuana use.   In any event, it does not appear that Plaintiff's

testimony concerning marijuana use was nearly as evasive as the ALJ made it out to be.

Furthermore, while under the Act, a person cannot be considered disabled for disability

benefits purposes if drug addiction or alcoholism is a contributing factor material to a disability

finding, *see Trent v. Astrue*, 2011 WL 841538 (N.D. Ohio 2011), the Regulations provide for the

following procedure to determine if drug addiction or alcoholism is material to the determination

of disability:

-18-

How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. §§ 404.1535 and 416.935. In other words, if the ALJ completes the five-step process outlined above and determines that a claimant is disabled with substance abuse, the ALJ must then proceed to conduct a second five-step analysis in order to determine if the claimant would still be disabled without the substance abuse. *Trent*, at \*3, citing, *Underwood v. Comm'r of Social Sec.*, 2010 WL 424970 at \*6, \*10 (N.D. Ohio 2010). The claimant has the burden of proving that substance abuse is not a factor material to the determination of disability. *Trent*, at \*3, citing, *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). The ALJ, however, retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. *See Underwood v. Comm'r of Soc. Sec.*,

2010 WL 424970 (N.D. Ohio 2010), citing, *Hildebrand v. Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002). "If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow." *Underwood*, at *6, citing, *Fastner v. Barnhart*, 324 F.3d 981, 86 (8th Cir.2003); *see also Brueggeman v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003) ("In colloquial terms, on the issue of the materiality of alcoholism, a tie goes to [the claimant]."). In this matter, the ALJ did not conduct the analysis of whether Plaintiff would be disabled without substance abuse. Rather, the ALJ short-circuited the process and summarily rejected the opinions of every physician in the record based upon purported inconsistencies in Plaintiff's testimony concerning his marijuana use. This was error.

The ALJ also overstated the import of Plaintiff's testimony concerning unemployment benefits.[6] In this matter, Plaintiff testified that he received approximately two and a half months of unemployment benefits after he stopped working at "Taco Troy" in the Spring of 2004 (Tr. 301-302). Plaintiff's alleged disability onset date is December 15, 2004 – almost certainly after he stopped receiving the two and a half months of unemployment benefits in the spring of 2004 (Tr. 15). The ALJ also noted, however, that Plaintiff might have applied for additional unemployment benefits – and certified he was able to work – after the apring of 2004. However, Plaintiff's testimony on this point is far from clear. Indeed, the ALJ and Plaintiff had the following discussion during the hearing:

---

[6] The Sixth Circuit has found that the collecting of unemployment benefits (requiring recipients to state that they are seeking work) stands at odds with allegations of disability under the Social Security Act. *See Workman v. Comm'r of Social Sec.*, 105 Fed. App'x. 794, 801, 2004 WL 1745782, *7 (6th Cir. 2004) (citing *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), upholding an ALJ's credibility determination on the basis that "[a]pplications for unemployment and disability benefits are inherently inconsistent"). *See also Bowden v. Comm'r Social Sec.*, 1999 WL 98378, *7 (6th Cir. 1999) (the claimant "offers no reasonable explanation of how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that she is ready and willing to work").

-20-

Q.      If, if there was still potential benefit entitlement for Unemployment Compensation, up to, up to now, would you still be certified for benefits and receiving them?

A.      I don't think so.

(Tr. 304)

***

Q.      If your Unemployment Comp eligibility were indefinite and you could continue receiving Unemployment Comp as long as you continued certifying for those benefits, would you have continued certifying for those benefits?

A.      Yes.

(Tr. 305-306)

Therefore, at a bare minimum, the testimony concerning Plaintiff's application for unemployment benefits is contradictory, and it is unclear from the record that Plaintiff fully understood what the ALJ was asking him. Plaintiff only responded in the affirmative after several attempts by the ALJ to rephrase the question. What is clear in the record, however, is that Plaintiff only actually received unemployment benefits sometime during 2004 – which appears to be prior to his alleged disability onset date of December 15, 2004. Thus, contrary to the ALJ's overall conclusion, Plaintiff's receipt of disability benefits prior to the onset date of disability is not inconsistent with his later assertion of disability. At a bare minimum, a remand is required to obtain clarification of Plaintiff's testimony concerning his intention to apply for unemployment benefits.

      Turning to Plaintiff's alleged failure to follow medical advice, in support of this conclusion, the ALJ cited only a single example that Plaintiff, namely a January 29, 2007 statement by Dr. Niani that Plaintiff "has not been following the diet and has been gaining more weight" (Tr. 21). The record overall, however, documents a long and continued course of treatment by Plaintiff. Undoubtedly Plaintiff struggled with his weight, however, the

-21-

undersigned cannot say that Plaintiff's struggle with his weight the record supports the broader conclusion that Plaintiff failed to follow medical advice.

Given the foregoing, remand is required for the ALJ to reevaluate Plaintiff's credibility and, if it is to again be discounted, to provide good reasons for doing so.

### 3.      The ALJ Provided An Inadequate Analysis At Step Three

The ALJ also erred by not setting forth his reasoning as to why Plaintiff failed to "meet" or "medically equal" a listed impairment at Step Three.  Indeed, the ALJ's opinion simply states at Step Three, in entirely conclusory fashion, that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments..."  (Tr. 20).  Arguably, Plaintiff meets Listing 4.02, which reads:

**4.02 *Chronic heart failure*** while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.

A. Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm *or ejection fraction of 30 percent or less* during a period of stability (not during an episode of acute heart failure); or

2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

-22-

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b (ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. § 404, Subpart P, App. 1 (emphasis added)

Here, the Court cannot say with confidence that the same disability outcome would have resulted had the ALJ performed a more rigorous "meets" or "medically equals" analysis at Step Three. The ALJ himself noted that Plaintiff ejection fraction was 25% on December 15, 2004; 20% on December 31, 2004; and 28% on April 17, 2006 – in other words, *less than 30%*. During the times that these ejection fractions were measured, Plaintiff was also noted to have been fatigued with a lack of energy. Thus, the ALJ's own factual findings indicate that Plaintiff may qualify under Listing 4.02.

When faced with similarly conclusory Step 3 analysis, courts have found that an ALJ's lack of narrative deprives the federal court of its ability to act as an appellate tribunal and instead forces the court to become the finder of fact:

In this case, the ALJ did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment. . . .  Such a bare conclusion is beyond meaningful judicial review. Under the Social Security Act,

> [t]he Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.

42 U.S.C. 405(b)(1). Under this statute, the ALJ was required to discuss the evidence and explain why he found that appellant was not disabled at step three.

This statutory requirement fits hand in glove with our standard of review. By congressional design, as well as by administrative due process standards, this court should not properly engage in the task of weighing evidence in cases before the Social Security Administration. Rather, we review the Secretary's decision only to determine whether [his] factual findings are supported by substantial evidence and whether [he] applied the correct legal standards.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *see also Miller v. Comm'r of Soc. Sec.*, 181 F. Supp. 2d 816, 820 (S.D. Ohio 2001) (citing *Clifton* with approval and explaining, "[t]he Commissioner argues that the error in this case, if any, was made by plaintiff, who failed to satisfy his Step 3 burden of coming forward with evidence to prove that he was disabled under the Listings. . . . [W]hether or not plaintiff came forward with the requisite evidence at Step 3, the ALJ was required to discuss that evidence, relative to the Listings, as required by *Clifton*.  As noted above, the ALJ failed to do so, thus meriting a sentence four remand."); *Torres v. Comm'r*

-24-

*of Soc. Sec.*, 279 Fed. App'x 149, 151-52 (3d Cir. 2008) ("This court has stated that it is the ALJ's responsibility to identify the relevant listed impairment(s) and develop the arguments both for and against granting benefits" (internal quotation marks, alterations, and citation omitted)); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) ("As we have recently noted, failure to discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand."); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000) ("Because we have no way to review the ALJ's hopelessly inadequate step three ruling, we will vacate and remand the case for a discussion of the evidence and an explanation of reasoning supporting a determination that Burnett's 'severe' impairment does not meet or is not equivalent to a listed impairment."); *Sorenson v. Astrue*, No. 10-C-0582, 2011 WL 1043362, at *9-11, (E.D. Wis. Mar. 18, 2011) (finding that ALJ's explanation that state DDS physicians reached a conclusion that the plaintiff did not "medically meet or equal a listed impairment" was "perfunctory" articulation where ALJ failed to identify any specific Listing used for comparison); *cf. Reynolds v. Comm'r of Soc. Sec.*, No. 09–2060, 2011 WL 1228165, at *3-4 (6th Cir. Apr. 1, 2011) (remanding where ALJ performed step three analysis for mental impairment but not for physical impairments, citing *Clifton* and *Burnett* with approval, and noting, "In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence").

In sum, the ALJ erred at Step Three by not discussing whether Plaintiff met or medically equaled a listed impairment.  Therefore, a remand is required so that the ALJ can undertake a more thorough Step Three analysis.

**4.       The ALJ Failed To Discuss The Effects Of Plaintiff's Weight**

Finally, I find that the ALJ did not perform an individualized assessment of the impact of

Plaintiff's obesity.  Although obesity was deleted from the Listing of Impairments in 20 C.F.R.,

subpart P, Appendix 1, the Commissioner should still address the issue:

> [E]ven though we deleted listing 9.09, we made some changes to
> the listings to ensure that obesity is still addressed in our listings.
> In the final rule, we added paragraphs to the prefaces of the
> musculoskeletal, respiratory, and cardiovascular body system
> listings that provide guidance about the potential effects obesity
> has in causing or contributing to impairments in those body
> systems. See listings sections 1.00Q, 3.00I, and 4.00F. The
> paragraphs state that we consider obesity to be a medically
> determinable impairment and remind adjudicators to consider its
> effects when evaluating disability. The provisions also remind
> adjudicators that the combined effects of obesity with other
> impairments can be greater than the effects of each of the
> impairments considered separately. They also instruct adjudicators
> to consider the effects of obesity not only under the listings but
> also when assessing a claim at other steps of the sequential
> evaluation process, including when assessing an individual's
> residual functional capacity.
>
> SSR 02-01p.

The medical records are replete with references to Plaintiff's obesity – Plaintiff weighed an

average of 367 pounds at a height of 6'5" during the time period at issue.[7]  However, the ALJ did

not mention SSR 02-01p in his decision or give any meaningful discussion of the effect of

Plaintiff's obesity, as required by SSR 02-01p.  The ALJ should have addressed the manner in

which Plaintiff's weight affected his ability to work.

Accordingly, the undersigned recommends that this matter be remanded pursuant to

sentence four of 42 U.S.C. § 405(g) to re-evaluate the impact of Plaintiff's obesity.  *See* SSR

---

[7]    These measurements suggest that Plaintiff has a body mass index (BMI) around 43.5.  *See* http://www.nhlbisupport.com/bmi/  A BMI over 30 indicates that a person is "obese."  *See id.*

02-1p, 2000 WL 628049, at *6; *see also, Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577
(6th Cir. 2009) (explaining that while "Social Security Ruling 02-01p does not mandate a
particular mode of analysis" regarding obesity, it "directs an ALJ to consider the claimant's
obesity, in combination with other impairments, at all stages of the sequential evaluation.");
*Besecker v. Astrue*, No. 3:07CV0310, 2008 WL 4000911, at *5-6 (S.D. Ohio Aug. 29, 2008)
("The *repeated references* to Plaintiff's obesity in the record, including the opinions of several
medical sources, should have alerted the ALJ to consider Plaintiff's obesity and its combined
impact with his other impairments at Steps 2, 3 and 4 of the sequential evaluation") (emphasis
added).

## III.    RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary
judgment be **GRANTED**, that Defendant's motion for summary judgment be **DENIED** and that,
pursuant to sentence four of 42 U.S.C. § 405(g), this matter be **REMANDED** for a new hearing
consistent with the discussion above.

The parties to this action may object to and seek review of this Report and
Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as
provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific
objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140
(1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United
States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise
some issues, but fail to raise others with specificity, will not preserve all the objections a party
might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931
F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.


s/Mark A. Randon_____
Mark A. Randon
United States Magistrate Judge

Dated:  January 19, 2012

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date,*
*January 19, 2012, by electronic and/or ordinary mail.*


*s/Melody R. Miles_____*
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*